# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JEANNETTE MARIE JANUSIAK,

      Petitioner,

v.                                                Case No. 17-C-514

WARDEN SARAH COOPER,

      Respondent.

## DECISION AND ORDER DENYING PETITION
## FOR RELIEF UNDER 28 U.S.C. § 2254

Petitioner Jeannette Marie Janusiak filed this petition pursuant to 28 U.S.C. § 2254, asserting that her state court conviction and sentence were imposed in violation of the Constitution. Janusiak was convicted in Sauk County Circuit Court of first degree intentional homicide in connection with the death of an infant in her care. She was sentenced to life with the possibility of extended supervision after 40 years of confinement. In her petition for federal relief under § 2254, Janusiak claims that her conviction is based upon incriminating statements she was coerced into making in violation of her Fifth and Fourteenth Amendment rights. Because the brutal nature of the crime seemed so inconsistent with the history and character of the accused, and because the circumstances surrounding her interview provided some support for her claim that her incriminating statements were coerced, I appointed counsel to represent Janusiak. Now, having carefully reviewed the entire record and considered the arguments of counsel, I conclude that the petition must be denied.

## BACKGROUND

Janusiak was convicted of intentionally causing the death of the four-month-old infant daughter of her friend. Janusiak took care of her friend's child, along with her own four children, on August 18, 2011. Although there was no evidence of motive, Janusiak was the only adult in the home with the children when the infant apparently sustained fatal injuries to her head. Other, older injuries were not accounted for. At trial, in the absence of any direct eye-witness account, the State relied on the forensic evidence relating to the injuries and their likely effect on the child, the circumstances surrounding the crime, and the statements made by Janusiak during a police interrogation that offered inconsistent and incredible explanations for the child's severe injuries. Highlighting her multiple, inconsistent, and unbelievable accounts of the death, the State attempted to show that Janusiak lied about how the child died. In her seven-hour interrogation, the entirety of which was shown to the jury, Janusiak changed her account of the infant's death three times: first, she said nothing out of the ordinary happened; later, she said the child fell off Janusiak's bed and onto the floor; and, finally, she said the infant fell from the bed, hit a table and an open drawer, and then hit the floor. ECF No. 12-16. Janusiak testified at trial that she did not know how the injuries to the child occurred, denied that she had done anything to harm her, and maintained that any statements she had made to the contrary were made after she became exhausted and simply tried to tell the officers what they wanted to hear so she could go home to her children. After an eight-day trial, the jury returned a guilty verdict.

The admissibility of Janusiak's interview was the subject of a pretrial hearing before the trial judge. Upon consideration of the evidence presented, including the video-recorded interview, the trial court issued a six-page decision in which it found that Janusiak's statements were voluntary,

considering the totality of the circumstances surrounding the interview, and not the product of police coercion or misconduct. ECF No. 12-4 at 78–86. After the trial, Janusiak appealed, claiming that the trial court had erred and that her statements were coerced. The Wisconsin Court of Appeals rejected Janusiak's arguments and affirmed her conviction, holding that the statements were voluntary because the officers' tactics did not overcome Janusiak's ability to resist. *State v. Janusiak*, 2016 WI App 18, ¶ 32, 367 Wis. 2d 349, 876 N.W.2d 178. Applying the totality of the circumstances test, the Court of Appeals first found that Janusiak's personal characteristics did not make her particularly vulnerable to coercion because Janusiak had nearly identical personal characteristics to those defendants in other cases whose incriminating statements were ruled admissible by the Wisconsin Supreme Court. *Id.* at ¶14. The court found that Janusiak's pregnancy, her one markedly unique characteristic, did not distinguish her from the relevant cases. *Id.* (citing *State v. Lemoine*, 2013 WI 5, ¶¶ 21–24, 26, 345 Wis. 2d 171, 827 N.W.2d 589; *State v. Reynolds*, 2010 WI App 56, ¶¶ 40, 51, 324 Wis. 2d 385, 781 N.W.2d 739). While the court acknowledged that pregnancy *could* render a woman particularly vulnerable to coercion, the court noted that it does not in every case, and concluded that it did not here since Janusiak seemed alert and was offered plenty of breaks. *Id.* at ¶15.

The Court of Appeals likewise affirmed the trial court's finding that the police had not engaged in coercive tactics. The general conditions of the interrogation did not amount to coercion. *See id.* at ¶¶ 18–19. Janusiak's more specific allegations, that police threatened to take her children away and falsely promised to send her home if she cooperated, were both described by the Court of Appeals as mischaracterizations of the interrogation. *Id.* at ¶¶ 22, 27. While Janusiak contends Hazel Coppernoll, Sauk County Human Services Supervisor, threatened to take her children away

3

unless she cooperated, the Court of Appeals clarified that Coppernoll specifically said she was *not* taking Janusiak's children into custody. *Id.* at ¶¶ 22–23. What Janusiak describes as a threat was Coppernoll's concern that if the infant's injuries were caused while she was in Janusiak's care, Janusiak's children might need protection, which could potentially involve removing them from Janusiak's home.

The Court of Appeals reached a similar conclusion on the alleged false promise of the law enforcement officers who questioned her. Janusiak claimed interrogators promised she could go home if she cooperated. *Id.* at ¶ 26. But the court noted that Janusiak's interrogators told her she could go home if she provided an exculpatory explanation for the infant's injuries that matched the medical evidence—not if she provided just any explanation. *Id.* at ¶ 27. To the extent this amounted to a police tactic, the court found it permissible.

The Wisconsin Supreme Court denied Janusiak's petition for review, and Janusiak then filed her petition for federal habeas corpus pursuant to § 2254. Now represented by counsel, Janusiak asserts several claims in support of her petition: 1) the Court of Appeals' decision was contrary to the Supreme Court decisions defining the totality of the circumstances test; 2) the Court of Appeals' decision was contrary to, or involves and unreasonable application of, *Lynumn v. Illinois*, 372 U.S. 528 (1963); 3) the Court of Appeals made an unreasonable finding about her emotional state; and 4) the Court of Appeals made unreasonable findings about the police officer's promises. Respondent denies that the Court of Appeals unreasonably applied the law or determined the facts.

## ANALYSIS

### A. Federal Relief Under § 2254

Janusiak seeks federal relief from her state court conviction under 28 U.S.C. § 2254. Under § 2254, a federal court can consider granting relief from a state court conviction only on grounds

4

that the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(1)(a). Janusiak's petition clearly states a claim that is cognizable under § 2254, since the Due Process Clause of the Fourteenth Amendment prohibits the use of coerced statements at a criminal trial. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

Janusiak's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254. Under AEDPA, habeas corpus relief for persons serving sentences imposed by state courts may not be granted on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule, or, in applying the proper legal rule, reached the opposite result as the Supreme Court on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision is an "unreasonable application of . . . clearly established Federal law" when the court applied Supreme Court precedent in "an objectively unreasonable manner." *Id.* Finally, the state court's determination of a factual issue is presumed to be correct, a presumption that can only be overcome by clear and convincing evidence. § 2254(e)(1).

This is, and was meant to be, a difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "[A] federal habeas court may not issue the writ simply because that court

5

concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003) (internal citation and quotation marks omitted).

**B. The Law of Confessions**

The federal law applicable to the admissibility of a defendant's statement in a criminal trial was recently summarized by the Seventh Circuit, sitting *en banc*, in *Dassey v. Dittmann*, 877 F.3d 297 (7th Cir. 2017). Rather than attempt to restate the principles the court so thoroughly explicated there, I will simply incorporate verbatim that section of the court's opinion:

> The Due Process Clause of the Fourteenth Amendment forbids the admission of an involuntary confession in evidence in a criminal prosecution. *Miller v. Fenton*, 474 U.S. 104, 109 (1985). In deciding whether a confession was voluntary, courts assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (collecting relevant factors). The purpose of this test is to determine whether "the defendant's will was in fact overborne." *Miller*, 474 U.S. at 116.
>
> The Supreme Court's many cases applying the voluntariness test have not distilled the doctrine into a comprehensive set of hard rules, though prohibitions on physical coercion are absolute. *See Mincey v. Arizona*, 437 U.S. 385, 401 (1978) (statements resulted from "virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness"); *Brown v. Mississippi*, 297 U.S. 278, 279 (1936) (confessions extracted by "brutality and violence"). AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied" because "even a general standard may be applied in an unreasonable manner." *Panetti*, 551 U.S. at 953, quoting *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in the judgment); *accord*, *Yarborough v. Alvarado*, 541 U.S. 652, 663–64 (2004).
>
> Nevertheless, applying a general standard like voluntariness "can demand a substantial element of judgment," and determining whether that judgment is reasonable "requires considering the rule's specificity." *Alvarado*, 541 U.S. at 664. "The more general the rule, the more leeway courts have in reaching outcomes in

6

case–by–case determinations." *Id.* (upholding state court *Miranda* conclusion where factors pointed in opposite directions). The state courts had such leeway here, and in the end, that leeway is decisive as we apply the test of § 2254(d)(1).

This general standard has some specific requirements to guide courts. First, a person arguing his confession was involuntary must show that the police engaged in coercive practices. *See Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986). Physically abusive interrogation tactics would constitute coercion per se. *Stein v. New York*, 346 U.S. 156, 182 (1953) (physical violence is per se coercion), *overruled on other grounds by Jackson v. Denno*, 378 U.S. 368, 381 (1964); *Brown*, 297 U.S. at 286–87 (coercion and brutality); *United States v. Jenkins*, 938 F.2d 934, 938 (9th Cir. 1991) (physical abuse is coercion per se); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986) (same).

Interrogation tactics short of physical force can amount to coercion. The Court has condemned tactics designed to exhaust suspects physically and mentally. Such tactics include long interrogation sessions or prolonged detention paired with repeated but relatively short questioning. *Davis v. North Carolina*, 384 U.S. 737, 752 (1966) (finding coercive the practice of repeated interrogations over sixteen days while the suspect was being held incommunicado).

The Supreme Court has not found that police tactics not involving physical or mental exhaustion taken alone were sufficient to show involuntariness. In several cases, the Court has held that officers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff. *See, e.g., Procunier v. Atchley*, 400 U.S. 446, 453–54 (1971) (suspect was deceived into confessing to false friend to obtain insurance payout to children and stepchildren); *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (deceiving suspect about another suspect's confession). False promises to a suspect have similarly not been seen as per se coercion, at least if they are not quite specific. *See Arizona v. Fulminante*, 499 U.S. 279, 285 (1991) (rejecting language in *Bram v. United States*, 168 U.S. 532 (1897), stating that a confession could not be obtained by "any direct or implied promises," *id.* at 542–43, but finding promise to protect suspect from threatened violence by others rendered confession involuntary); Welsh S. White, *Confessions Induced by Broken Government Promises*, 43 Duke L.J. 947, 953 (1994).

False promises may be evidence of involuntariness, at least when paired with more coercive practices or especially vulnerable defendants as part of the totality of the circumstances. *E.g., Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (pre–*Miranda* confession found involuntary based on false promise of leniency to indigent mother with young children, combined with threats to remove her children and to terminate welfare benefits, along with other factors). But the Supreme Court allows police interrogators to tell a suspect that "a cooperative attitude" would be to his benefit.

7

> *Fare v. Michael C.*, 442 U.S. 707, 727 (1979) (reversing finding that confession was involuntary). Supreme Court precedents do not draw bright lines on this subject.
>
> In assessing voluntariness, courts must weigh the tactics and setting of the interrogation alongside any particular vulnerabilities of the suspect. *Bustamonte*, 412 U.S. at 226. Relevant factors include the suspect's age, intelligence, and education, as well as his familiarity with the criminal justice system. *Withrow*, 507 U.S. at 693–94 (collecting factors); *Michael C.*, 442 U.S. at 725–26 (significant criminal justice experience); *Clewis v. Texas*, 386 U.S. 707, 712 (1967) (limited educational attainment); *Culombe v. Connecticut*, 367 U.S. 568, 620 (1961) (intellectual disability); *Gallegos v. Colorado*, 370 U.S. 49, 53 (1962) (age).

*Id.* at 303–04.

**C. Application of Clearly Established Federal Law**

Janusiak asserts that the Wisconsin Court of Appeals did not properly apply federal law when it considered her "personal characteristics" and the "pressures and tactics" separately, rather than in totality. ECF No. 26 at 34–36. While it may be true that none of the factors, considered individually, prove that her statements were involuntary, Janusiak argues that considered in their totality, the factors compel the conclusion that her statements were coerced. By failing to consider all of the factors together, Janusiak argues, the Court of Appeals unreasonably applied clearly established federal law.

This argument finds its refutation in the express words of the Court of Appeals' decision. Citing the Wisconsin Supreme Court's decision in *State v. Hoppe*, 2003 WI 43, ¶ 34, 261 Wis. 2d 294, 661 N.W.2d 407, the state court of appeals noted that "[t]o determine whether a defendant's statements were voluntary, we balance the personal characteristics of a defendant against 'pressures and tactics' that police used to induce the statements, considering the totality of the circumstances." 367 Wis. 2d 349, ¶ 10. This is essentially the same test for voluntariness that the United States Supreme Court set out in *Bustamonte*. 412 U.S. at 226; *see also Dassey*, 877 F.3d at 303–04. After

8

a thorough analysis of the evidence relating to Janusiak's personal characteristics and the pressures and tactics used by police, the court concluded:

> In sum, applying the *Hoppe* balancing test to the totality of the circumstances, we conclude that, given Janusiak's personal characteristics, the pressures and tactics of the officers did not overcome her ability to resist. For these reasons, we conclude that the State demonstrated that Janusiak's statements were voluntarily made, and therefore admissible at trial.

367 Wis. 2d 349, ¶ 32.

Janusiak argues that, notwithstanding the court's explicit consideration of the totality of the circumstances, the court did not properly apply the test because it considered the two categories of "personal characteristics" and "pressures and tactics" separately under separate headings and "without considering whether a common thread ran through them, much less whether they were related to her personal characteristics." Br. in Supp., ECF No. 26, at 36. The argument is unpersuasive. The fact that the court discussed the factors separately does not mean that it did not consider the totality of factors together in reaching its ultimate conclusion. Indeed, it is difficult to see how a court can write a coherent decision without separately discussing the various factors under consideration.

Janusiak's real complaint seems to be that the court of appeals did not conclude from its consideration of her personal characteristics and the pressures and tactics of the police that she was particularly vulnerable and the police tactics were coercive. But a petitioner's disagreement over a state court's application of clearly established federal law is not enough to show unreasonable application of that law. The Wisconsin Court of Appeals' decision that Janusiak's statements were voluntary and admissible did not result in an unreasonable application of the totality of the circumstances test. Nor were the determinations on which that conclusion rests.

9

The state court's determination that Janusiak's personal characteristics did not make her particularly vulnerable to coercion is not contrary to or an unreasonable application of clearly established federal law. Janusiak was nearly halfway through her twenties when she was interrogated, with the maturity and experience brought on by raising four children and preparing for a fifth. Janusiak had a high-school equivalency diploma and her record reflected a familiarity with police. Although Janusiak was almost eight months pregnant at the time of her interrogation, no pertinent pregnancy-related symptoms were apparent during her interrogation. Moreover, no Supreme Court precedent compels a ruling that advanced pregnancy calls for the *de facto* finding that a defendant is particularly vulnerable to coercion.

The state court's conclusion that Janusiak's interrogators did not use improper or coercive tactics was likewise neither contrary to nor an unreasonable application of clearly established federal law. Janusiak was afforded ample opportunities to use the restroom, smoke cigarettes (despite her advanced pregnancy), eat, and drink. She may not have always accepted the opportunities, but they were offered. While the interrogation was long, no Supreme Court precedent compels a ruling that a 7-hour interrogation must be deemed coercive due to its length alone. More important than the length of the interrogation is the fact that no threats or false promises were ever made.

Janusiak disagrees strongly with the state court's conclusion that no threats or false promises were made. She contends that the police threatened to take her children away if she did not offer some explanation for the deceased child's injuries and promised she could go home with her children if she offered such an explanation. The Court of Appeals' determination that her statements were voluntary despite such tactics, she argues, constitutes an unreasonable application of *Lynumn v. Illinois*. In *Lynumn*, the Supreme Court held that the defendant's confession to possession and

10

sale of marijuana was involuntary because it was induced by police threats that state financial aid for her infant children would be cut off and her children would be taken from her if she did not cooperate. 372 U.S. at 529–30. Janusiak argues *Lynumn* controls here.

This case differs in several respects from *Lynumn*, however. First, *Lynumn* was decided several years before *Miranda v. Arizona*, 384 U.S. 436 (1966), and thus, unlike Janusiak, the petitioner in that case was not provided the prophylactic set of warnings that have since become common knowledge within the culture even to those who have never been arrested. This fact alone is significant. *See Loza v. Mitchell*, 766 F.3d 466, 480 (6th Cir. 2014) ("First—and most importantly—*Spano* and *Lynumn* pre-dated *Miranda*. Unlike the defendants in these cases, Loza was read his *Miranda* rights and voluntarily waived them, making it very difficult for him to demonstrate that his confession was nonetheless involuntary."). Also unlike Janusiak, the petitioner in *Lynumn* "had no previous experience with the criminal law." 372 U.S. at 534. Janusiak, in contrast, had five prior convictions, including one for obstructing an officer which involved lying to police.

The substance of what was said by the officers in the two cases is also significantly different. In *Lynumn*, the officers threatened the petitioner with the loss of her children if she did not confess to possession and sale of marijuana. But in this case, no one told Janusiak that her children would be taken from her if she didn't confess to harming a child. In fact, Janusiak was told just the opposite—that her children *were not* being taken from her. Coppernoll, the social worker, stated:

> [W]ell, I just want to let you know, I did talk with your child. At this point, I'm *not* taking them into custody . . . . I'm obviously very concerned about your own children if this happened at your home . . . . I want you to be aware of that then . . . . I'm looking into that very closely.

11

Interview Transcript, ECF 12-16 at 179 (emphasis added). The clear implication was that if she was responsible for the injuries to the deceased child, her own children would be removed from her home. As the Court of Appeals aptly noted, Coppernoll's concern would hardly have encouraged Janusiak to incriminate herself. "In fact, if anything, Coppernoll's statements would most likely have had the effect of causing Janusiak to continue to deny that the baby was injured in any manner at her home, whether accidental or otherwise." *Janusiak*, 367 Wis. 2d 349, at ¶ 23.

Although it is true that Coppernoll discussed the possibility of the children being removed, there was no threat to remove them. Coppernoll's statement that if a child was inexplicably found to have sustained a brutal beating and fatal injuries while in Janusiak's care, Coppernoll would likely conclude that Janusiak's own children would need protection—potentially meaning removal from Janusiak's house—does not amount to a threat. It was simply the explicit acknowledgement of an obvious fact, given the circumstances.

Janusiak likewise alleges the police officers played off of Coppernoll's visit to suggest to Janusiak that the State might take her children, in order to keep Janusiak talking. Janusiak alleges the officers did this knowing that Janusiak was a stay-at-home mom, who had never been away from her kids for a lengthy period of time. The interrogating officers only made two overt references to Janusiak's children, however. In the first instance, after Janusiak stated she didn't want to go to jail, the detective informed her that he doesn't want her to go to jail either, stating he'd rather send her home with her kids. ECF 12-16 at 221. In the second instance, the chief of police explained that if Janusiak went to jail, she wouldn't be with her children. *Id*. at 245.

In neither instance did police threaten to take away Janusiak's children. The officers simply explained the unfortunate reality of being arrested: that she would be taken to jail, away from her

12

children. Instead of threatening harm to her children, the officers assured Janusiak that her children would not be left alone, but would be taken care of and remain with her parents. *Id*. at 286. Importantly, even after the officers made these comments, Janusiak continued to remain firm in her denial of any wrong doing. After the officer remarked that he'd rather send her home, he asked her if she can think of anything else. Janusiak again insisted that she didn't do anything. *Id*. at 222.

In these respects also, the facts of this case are significantly different than those of *Lynumn*. In *Lynumn*, the petitioner was implicated in a drug crime by a person who police told if "he 'would set somebody up for them, they would go light' on him." 372 U.S. at 529. He then took police to the petitioner's apartment building, entered her third floor apartment while officers waited below, and exited five to twenty minutes later with a package containing marijuana. Officers then had him return to the apartment on a pretext, and arrested the petitioner when she answered the door. The petitioner initially denied any knowledge of drugs and stated that the informant had merely repaid a loan, but when she was threatened with the cut-off of financial aid and loss of custody of her children, she later relented and told police she had sold the informant marijuana as they insisted. Based on the facts of that case, the prosecutor "conceded, at least for purposes of argument, that the totality of circumstances disclosed by the record must be deemed to have combined to produce an impellingly coercive effect upon the petitioner at the time she told the officers she had sold marijuana to Zeno." *Id.* at 534–35.

No such concession was made here. More importantly, the dilemma in which Janusiak found herself did not arise out of unsubstantiated accusations of a drug offender trying to curry favor with the police. A four-month-old infant left in Janusiak's care had been brutally beaten. The child died as a result of severe brain damage that was caused by multiple blows of blunt force trauma. The

13

child's body was covered in bruises that appeared the result of violent grabbing by an adult. The injuries were immediately observable by the first responders and by the emergency room physician. Yet cell phone photographs taken of the child only 24 hours before she arrived at the hospital emergency room showed no bruising, and Janusiak claimed the child was fine when she put the child to bed that evening. By Janusiak's own account, no other adult was in the home at the time, and her own children could not have caused the injuries.

Given these facts, no reasonable person in Janusiak's position would have believed that absent an exculpatory explanation for the child's injuries, she would be allowed to return home with her own children. The interview was little more than a protracted effort to allow Janusiak to provide some alternative explanation that would absolve her of responsibility for the fatal injuries to the child—that they were somehow accidental or perhaps caused by someone else. Absent an innocent explanation for the child's injuries, Janusiak was going to be arrested and charged with the child's death. It was this fact, not any threat by law enforcement or a social worker, that left Janusiak with no logical choice but to offer whatever alternative explanation came to mind.

Janusiak had a strong reason, even a compelling reason, to offer an alternative explanation for the crime that from all available evidence it appeared she had committed. But a reason to offer an alternative explanation that arises from the actual evidence in the case, even when pointed out by police, does not constitute police coercion. *See, e.g.*, *United States v. Miller*, 450 F.3d 270, 272 (7th Cir. 2006) ("An objectively unwarranted threat to arrest or hold a suspect's paramour, spouse, or relative without probable cause could be the sort of overbearing conduct that society discourages by excluding the resultant statements. *See Lynumn v. Illinois*, 372 U.S. 528 (1963) (which we understood in *Johnson* [*v. Trigg*, 28 F.3d 639 (7th Cir. 1994),] to demonstrate that hostage-taking

is unduly coercive). But a factually accurate statement that the police will act on probable cause to arrest a third party unless the suspect cooperates differs from taking hostages."), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007). In this case, law enforcement had probable cause and the intent to arrest and charge Janusiak with the murder of the child fatally injured while in her custody, absent an exculpatory explanation known only to her. It was not police coercion to offer her an opportunity to provide such an explanation. For all of these reasons, the decision of the Wisconsin Court of Appeals is neither contrary to, nor an unreasonable application of, *Lynumn*.

In sum, Janusiak's argument that clearly established federal law was either ignored or unreasonably applied is unpersuasive. Janusiak merely disagrees with the manner in which clearly established federal law was applied. Again, the mere fact that the Court of Appeals discussed the factors separately does not mean that they were weighed separately and not in totality. Courts have considerable discretion when weighing factors and applying the totality of the circumstances test. Under AEDPA, federal courts reviewing state court convictions must defer to that discretion. As the court explained in *Dassey*:

> Under AEDPA, the essential point here is that the totality-of-the-circumstances test gives courts considerable room for judgment in cases like this one, where the factors point in both directions. Given the many relevant factors and the substantial weight of factors supporting a finding that Dassey's confession was voluntary, the state court's decision was not an unreasonable application of Supreme Court precedent. . . . Emphasizing that the more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations, the Supreme Court found that the state court finding was not an unreasonable application of binding precedent . . . ."

877 F.3d at 313 (citing *Alvarado*, 541 U.S. at 664–65). I reach the same conclusion here.

**D. Unreasonable Determination of the Facts**

Janusiak next challenges two of the state court's factual findings. She claims it was unreasonable for the Court of Appeals to find that officers "wait[ed] for Janusiak to stop crying and calm down before questioning her" because Janusiak claims she had numerous bouts of sobbing during the last four hours of questioning. She also claims the Court of Appeals erred in determining that officers truthfully told her that she could go home if she provided an exculpatory explanation and that the officers did not make any illusory promises. Janusiak asserts that these erroneous factual determinations affected the state court's totality of the circumstances determination.

Under AEDPA, a "federal habeas court must accept a state-court finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (citing 28 U.S.C. § 2254(d)(2)). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Id.* (citing *Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (citing 28 U.S.C. § 2254(e)(1)).

In particular, Janusiak objects to the Court of Appeals' statement that officers "wait[ed] for Janusiak to stop crying and calm down before questioning her." *Janusiak*, 367 Wis. 2d 349, ¶ 20. Janusiak claims the finding is unreasonable because the video of the interview shows she cried several times throughout the questioning. But the Court of Appeals did not say that Janusiak did not resume crying later during the interview. Instead, the appellate court noted that she was not crying when the interview began and that officers did not appear to take advantage of her emotional state when she cried in their presence. *Id.* at ¶¶ 13, 17. While officers may not have halted questioning every time Janusiak began to cry, that does not mean that they were not respectful of her or that they

took advantage of her emotions. When the interview is viewed in its entirety, the court's determination that the officers did not take advantage of Janusiak crying is not an unreasonable determination of the evidence. *See, e.g.*, Interview Transcript, ECF 12-16, at 42, 199 (asking Janusiak if she was okay when she looked upset or after a break). Janusiak has failed to show that this finding was unreasonable in light of the evidence presented.

Janusiak also alleges the Court of Appeals erred in determining that officers truthfully told her that she could go home if she provided an exculpatory explanation. She contends that the officers never had any intention of letting her go home and that their promises were entirely illusory, intended to elicit explanations that the medical evidence, as they understood it, clearly refuted.

A false promise occurs when an interrogator makes a promise that is "materially false and thus sufficient to overbear [the defendant's] free will." *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009) (citing *United States v. Montgomery*, 555 F.3d 623, 630 (7th Cir. 2009)). For instance, in *Sharp v. Rohling*, 793 F.3d 1216 (10th Cir. 2015), an interrogator made a promise to the defendant that she would not go to jail for her role in a murder. The promise was patently false, because she was arrested at the end of the interview. *Id.* at 1235. The Tenth Circuit ruled that the incriminating statements were involuntary due to the false promise of leniency, as they were doubtlessly made because of coercion rather than calculation. *Id.* at 1234.

Here, however, the Court of Appeals found that Janusiak's interrogators never promised that she would be reunited with her children and sent home if she gave any explanation for the child's death. To the contrary, the officers suggested that she could go home *only* if she provided an exculpatory explanation that fit the medical evidence they had been provided—three separate skull fractures, etc. In other words, Janusiak's interrogators truthfully conveyed a possible benefit of

17

statements matching the evidence. Such a statement was never given. And the allegedly coerced statement that the child fell off Janusiak's bed, the officers made quite clear, was not consistent with the medical evidence and would result in arrest. The state court's findings are not unreasonable in light of the evidence presented. They are therefore presumptively correct, and Janusiak has offered no clear and convincing evidence to rebut them. § 2254(e)(1).

## CONCLUSION

Because the Court of Appeals did not unreasonably apply clearly established federal law or unreasonably determine the facts in light of the evidence presented, Janusiak is not entitled to relief under § 2254. Given that conclusion, there is no reason to address the Respondent's argument that even if the statements were deemed inadmissible, such error was harmless. For the reasons given above, Janusiak's petition for a writ of habeas corpus is **DENIED**. A certificate of appealability will issue, however, since reasonable jurists could conclude otherwise. The Clerk is directed to enter judgment denying the petition and dismissing the action. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this __2nd__ day of January, 2019.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court